**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID GUYER,** | : | **Civil No. 3:25-CV-1690** |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **FRANK BISIGNANO,** | : | **(Magistrate Judge Carlson)** |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

# REPORT AND RECOMMENDATION

## I. Introduction

The plaintiff in this case, David Guyer, suffers from an array of impairments, including diabetes mellitus, peripheral neuropathy, and spine disorders which, undisputedly, restrict his work-related abilities but which the administrative law judge (ALJ) in the case found were not entirely disabling. Guyer now challenges the decision of the ALJ denying him disability benefits, arguing that the ALJ committed multiple errors in evaluating the medical opinion evidence and his symptoms in compliance with the Social Security Regulations.

Our analysis of this case is cabined and confined by the standard of review in Social Security cases, which is limited by the Supreme Court's mandate that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Under this standard of review, we are obliged to affirm the decision of the administrative law judge (ALJ) once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)).

Here, after a review of the record, mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the

reasons set forth below, we recommend the Court affirm the decision of the Commissioner denying this claim.

## II. Statement of Facts and of the Case

The administrative record of Guyer's disability application reveals the following essential facts: On March 30, 2023, Guyer applied for benefits under Title II of the Social Security Act, alleging an onset of disability beginning March 1, 2023. (Tr. 17). According to Guyer, he was completely disabled due to the combined effects of diabetes, high blood pressure, neuropathy, glaucoma, cataracts, and acid reflux. (Tr. 57). Guyer was born on March 22, 1973, and was forty-nine years old on his alleged disability onset date, which is defined as a younger individual under the Commissioner's regulations, but he soon transitioned to an individual approaching advanced age. (Tr. 57). He has a high school education and previously worked as a used car salesman and hospital equipment sales representative. (Tr. 51).

### A. The Objective Medical Evidence

The evidence throughout the relevant period demonstrates that Guyer suffered from neuropathy causing numbness and tingling in his feet. Nonetheless, at the beginning of the disability period in March 2023, when Guyer established care with a primary care physician, he noted he had not seen a physician since he was in his twenties over two decades earlier. (Tr. 338). At that time, Guyer noted a history of

diabetes with increased urination and thirst in the prior year as well as neuropathy in his feet for which he was taking his partner's gabapentin and found it helpful. (Id.) As the ALJ aptly summarized when considering the medical record of the plaintiff's impairments:

> Turning to the medical evidence, the claimant presented for a new patient checkup on March 25, 2023 (Exhibit 1F/14). He reported pain and numbness in his feet and high blood sugars. He had a history of diabetes mellitus. He was sitting comfortably in his chair during his physical exam (Exhibit 1F/16). He was in no acute distress. There was no peripheral edema. He had 5/5 strength in the upper and lower extremities, and he moved all four extremities. His monofilament test was normal, and there were no wounds or lesions in his feet. His A1C was 10.1. He was started on metformin, Trulicity, and glipizide. The claimant returned for an acute appointment on April 5, 2023, reporting developing a sore on his lateral malleolus after wearing a new pair of boots (Exhibit 1F/10-11). His exam showed a scabbed over area on the lateral malleolus of his right foot without signs of infection, redness, fluctuance, or drainage. The claimant had a follow-up visit on April 19, 2023 (Exhibit 1F/3). He reported feeling tired and sluggish, and his home blood sugars ranged from 120s to 130s and never over 200 recently. He reported that he started working part-time, and that full-time work would be too much for him. His physical exam showed no acute distress, 5/5 strength in upper and lower extremities, movement of all four extremities, and no edema (Exhibit 1F/6). He was advised to continue gabapentin for neuropathy.
>
> The claimant presented for an endocrinology visit on May 25, 2023 (Exhibit 7F/12). His medications were adjusted due to reports of loose stools. He was referred to neurology due to complaints of neuropathy that was not improved with gabapentin.
>
> The claimant presented for a podiatry evaluation on June 12, 2023 (Exhibit 2F/3). He reported that his open wound had healed prior to his visit. He reported no pain or discomfort in the area. He described his

> feet as very sensitive with some burning sensation in them. He reported some benefit from gabapentin, but that he continued to have burning. His exam revealed hair growth but diminished to the bilateral feet (Exhibit 2F/7-8). Monofilament testing revealed hypersensitivity to all areas of the bilateral feet with absent vibratory sensation at the bilateral first metatarsal heads, but present vibratory sensation at the bilateral medial malleoli. He had an appropriate affect. His gait was unimpaired. He maintained 5/5 muscle strength in both ankles and great toes. The claimant had a diagnosis for systemic inflammatory response syndrome ("SIRS") following a hospitalization from July 10-12, 2023, for an upper gastrointestinal bleed (Exhibit 4F/11). His physical exam during that admission found tachycardia and abdominal distension, and he had normal musculoskeletal range of motion, normal range of motion in the cervical back, and no edema in the lower extremities (Exhibit 4F/14). He had normal pulmonary effort.
>
> The claimant had a follow-up visit with his internal medicine clinic on July 20, 2023 (Exhibit 5F/3-4). His blood pressure was normal. He reported that he tended to drink liquor on the weekends, and that he did not take painkillers. He denied side effects from gabapentin. He reported walking fine and doing everything normally but feeling slower. His exam was grossly within normal limits, including 5/5 strength in the extremities (Exhibit 5F/7).

(Tr. 23-24).

The plaintiff also underwent a consultative examination in August 2023 by Dr. Ahmed Kneifati which showed some postural difficulties but full strength in all extremities and intact hand and finger dexterity. As the ALJ summarized:

> The claimant underwent a consultative examination with Ahmed Kneifati, M.D., on August 22, 2023 (Exhibit 6F/3-7, 14-17). He reported that his blood sugar was 220 in the morning before breakfast. He also reported problems with balance and diabetic neuropathy in his feet and hands. He did not use an assistive device. His vision was 20/25 in the right and left eye, and 20/20 in both eyes with glasses. The

> claimant presented in no acute distress, walking in short steps, and he was able to stand on his toes. He was able to walk on his toes, but he was unsteady. He was able to squat to 50 percent. He had a normal stance. He did not need help getting on and off the exam table. He had no difficulty rising from a chair. There was mild tenderness in the epigastric region. The claimant had negative straight leg raises in both the supine and seated positions without pain. There was no evident joint deformity. He had stable and tender joints without redness, heat, or effusion. There were no trigger points. His neurologic exam showed hypoesthesia below the knees to the toes bilaterally to light touch. His deep tendon reflexes were equal and physiologic in the upper and lower extremities. He had 5/5 strength in the upper and lower extremities. There was no muscle atrophy evident. He had intact hand and finger dexterity. He was able to zip, button, and tie shoelaces. The claimant's range of motion was within normal limits, except for limited flexion-extension and lateral flexion in the lumbar region.

(Tr. 24).

The ALJ went on to summarize the following unremarkable treatment records throughout the remaining disability period:

> The claimant had a follow-up visit with his endocrinology clinic on August 31, 2023 (Exhibit 7F/6). He was advised to increase his Trulicity and continue his metformin as prescribed. His review of system was positive for back pain and myalgias, and numbness (Exhibit 7F/8). His exam was unremarkable.
>
> An x-ray of the claimant's lumbosacral spine, completed on September 7, 2023, demonstrated no fracture or subluxation (Exhibit 8F). There were small ventral and/or lateral osteophytes at multiple levels.
>
> The claimant presented on January 30, 2024, for follow-up after his emergency department visit earlier that month (Exhibit 18F). He reported feeling good at times and eating large amounts of food, but subsequently feeling abdominal discomfort and nausea the next day.

> His stools had been normal. The claimant reported compliance with his diabetes medications with blood sugars ranging from 94 to 140s. His exam was unremarkable except for abdominal tenderness. The claimant's A1C went down from 10.1 to 6.1 by May 15, 2024 (Exhibit 20F). His renal function was stable.

(Tr. 24-25).

**B. The Medical Opinion Evidence**

Given this clinical picture, consultative examiner Dr. Kneifati and two State agency medical consultants opined on Guyer's physical ability to perform work-related activities. The State agency medical sources concurred that Guyer could perform a range of light work with some postural and environmental limitations. In September 2023, Dr. Mary Louise Gavin opined that Guyer could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds, could stand and/or walk and sit for a total of six hours in an eight-hour workday, but could only occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, and crawl and could only frequently kneel and crouch. (Tr. 60). Dr. Gavin further opined that the plaintiff had no manipulative limitations, but that he should avoid concentrated exposure to extreme cold, hot, wetness, humidity, vibration, and hazards. (Tr. 61). On reconsideration, Dr. Gwendolyn Galasso concurred with the limitations set out by Dr. Gavin which concluded Guyer was capable of light work with certain postural and environmental limitations. (Tr. 67-71).

The opinions of the State agency consultants were cast against the opinion of consultative examiner Dr. Kneifati whose opined limitations were more conservative than those of the non-examining experts. According to Dr. Kneifati, Guyer was capable of only a limited range of less than sedentary work. (Tr. 441-46). Dr. Kneifati opined that Guyer could only occasionally lift and carry less than ten pounds, but never more, due to GI bleeding, TBI,[1] reduced range of motion, and poor balance. Dr. Kneifati further opined that the plaintiff could sit for five hours total and one hour at one time, stand for three hours total and thirty minutes at one time, and walk for two hours total and twenty minutes at one time in an eight-hour workday, and could only frequently operate foot controls, though he opined he could continuously use his hands and arms. (Tr. 442-43). Dr. Kneifati also opined Guyer could never climb ladders or scaffolds or balance, but could occasionally climb stairs and ramps, stood, kneel, crouch, and crawl. (Tr. 444).

[1] As explained below, the ALJ partially found this opinion unpersuasive since it references a traumatic brain injury (TBI) that is seemingly not supported by the medical record. Dr. Kneifati's diagnoses included "traumatic brain injury resulting from gastrointestinal bleeding with hypotension," and he references this impairment in support of his limitations but, similarly to the ALJ, we find no objective documentation, nor does the plaintiff point us to any, of a traumatic brain injury in the record. Thus, it is entirely unclear to us what Dr. Kneifati is referencing with regard to the support for these lift/carry limitations.

It was against this medical background that Guyer's case came to be considered by the ALJ.

**C. The ALJ Decision**

A hearing was conducted in Guyer's case on September 10, 2024, at which Guyer and a vocational expert testified. (Tr. 36-55). Following this hearing, on October 1, 2024, the ALJ issued a decision in Guyer's case. (Tr. 14-35). In that decision, the ALJ first concluded that Guyer met the insured requirements of the Act through March 31, 2026, and had not engaged in substantial gainful activity since the alleged onset date of March 1, 2023. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Guyer had the following severe impairments: diabetes mellitus type 2, peripheral neuropathy, skeletal spine disorder, and systemic inflammatory response syndrome ("SIRS"). (Id.)

At Step 3, the ALJ determined that Guyer did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 21-22).

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Guyer's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in

> 20 CFR 404.1567(b) except he requires a sit/stand option allowing him to change positions as needed up to twice per hour while remaining on task. He can occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch, or crawl, and he can never climb ladders, ropes, or scaffolds. He can frequently handle, finger, and feel bilaterally. The claimant must avoid concentrated exposure to extreme temperatures, to humidity, wetness, and vibration, and he must avoid all exposure to hazards.

(Tr. 22).

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Guyer's self-described limitations. (Tr. 22-28). The ALJ first engaged in a two-step process to evaluate Guyer's alleged symptoms, finding that, although the plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Id.)

In making this determination, the ALJ considered Guyer's statements and testimony regarding his impairments and limitations, noting:

> The claimant alleged disability due to diabetes and neuropathy (Exhibit 3E). He reported that his insulin was increased in July 2023, and that he has had worsening neuropathy (Exhibit 10E). His reported medications included gabapentin, Trulicity, metformin, and glipizide, amongst others (Exhibits 11E; 20E; 9F). He reported pain in his legs, feet, and hands, and headaches (Exhibits 6E; 13E). He described his pain as daily, moderate and burning, and he reported numbness. The claimant testified that he has had ongoing issues with high blood sugar. He also testified that he has daily back pain.

> The claimant completed Function Reports, alleging limitations with lifting, standing, walking, sitting, bending, kneeling, stair climbing, using his hands, and concentration (Exhibits 7E; 14E). He testified that he could lift or carry 20-30 pounds, but that he could not do so throughout the day because he tires quickly. He reported being able to walk for a half block before needing to stop and rest for 10-15 minutes. He also reported being able to pay attention for 30 minutes at a time. He alleged physical limitations due to numbness in his legs, fatigue, and dizziness. He testified that he could stand for 15-20 minutes at one time, and that he could sit for about one hour before he has back pain. He alleged difficulty holding onto items due to numbness in his hands. There were no reported issues with his personal care, including dressing and bathing. The claimant stated that he is able to prepare simple meals and do light cooking. He also stated that he is able to go out alone, drive, shop in stores, and manage money. He testified that he does not drive when he has numbness. He reported daily activities that included watching television and playing on his phone.

(Tr. 23).

The ALJ considered these statements in the context of the longitudinal medical evidence of record and concluded this objective evidence did not fully support the plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms. The ALJ specifically considered the limiting effects of the plaintiff's neuropathy and diabetes symptoms and acknowledged the plaintiff had complained of ongoing neuropathic symptoms but that objective testing and examinations did not support the debilitating symptoms he alleged. As the ALJ explained:

The claimant's alleged severity of his diabetes symptoms, including pain in his lower extremities and hands, headaches, and numbness are not consistent with the medical evidence. The medical evidence shows that the claimant has had routine medical visits and follow-ups without notable complications from his diabetes, which were managed with medications (Exhibits 1F/3-14; 7F/6, 12; 18F). Notably, his A1C had improved from 10.1 to 6.1 by May 15, 2024, which was just over one year after his alleged onset of disability. Additionally, while the claimant testified that he has had ongoing issues with high blood sugar levels, he reported blood sugar levels that ranged from 94 to 140s, and generally never more than 200, except when he reported a morning blood sugar of 220 prior to eating breakfast during his consultative examination (Exhibits 1F/3; 6F/3-7; 18F). The medical evidence does not show blood sugars close to 300 as he testified. The claimant did report ongoing neuropathic symptoms during his primary care and endocrinology visits; however, the exams did not show pervasive and chronic symptoms as alleged by the claimant (Exhibits 1F/14; 7F/8, 12). For example, monofilament testing from June 12, 2023, was notable for hypersensitivity in the bilateral feet with absent vibratory sensation, but his gait was unimpaired (Exhibit 2F/7-8). A monofilament test from March 25, 2023, which was within the month he alleged an onset of disability, was normal (Exhibit 1F/16). By July 20, 2023, the claimant reported walking and doing everything normally but feeling slower (Exhibit 5F/3-4). He exhibited some unsteadiness with toe walking, and he had some limited ability to squat during his consultative examination on August 22, 2023 (Exhibit 6F/3-7). There was also hypoesthesia below the knees to the toes bilaterally to light touch. The consultative examination and other exams of record showed no deficits in strength or other musculoskeletal abnormalities consistent with debilitating neuropathic symptoms from his diabetes (Exhibits 1F/6, 16; 2F/7-8; 4F/14; 5F/7; 6F/3-7, 14-17). I also note that, while the claimant alleged neuropathy affecting his hands and manipulative abilities, he demonstrated intact hand and finger dexterity, and he was able to zip, button, and tie shoelaces during his consultative examination. The medical evidence is not consistent with the alleged severity of his diabetic neuropathy or other complications from diabetes.

(Tr. 25). The ALJ also found the plaintiff's complaints of daily back pain inconsistent with medical evidence showing virtually no complaints or treatment for back impairments despite some evidence of degenerative changes in the lumbar spine with limited range of motion.

Overall, the ALJ accounted for the limitations from the plaintiff's impairments to the extent they were supported by objective medical findings, including limiting the plaintiff to a sit/stand option allowing him to change positions as needed up to twice per hour to account for his neuropathic symptoms. As the ALJ further explained:

> The medical evidence does not support the claimant's alleged physical functional limitations due to his diabetes, neuropathy, SIRS, or lumbar spine disorder. He reported being unable to walk for more than a half block before needing to rest, and he reported being unable to stand for more than 20 minutes or sit for more than 20 minutes due to his pain. He also reported limited ability to hold onto items due to hand numbness. However, as previously noted, his exams have not documented any losses in motor strength, gait abnormalities, or other musculoskeletal deficits other than some limited range of motion in his lumbar region (Exhibits 1F/6, 16; 2F/7-8; 4F/14; 5F/7; 6F/3-7, 14-17). He has been able to move his extremities, and he has had intact hand and finger dexterity. There were some findings for neuropathy and SIRS, but this does not appear to have resulted in significant physical limitations, as his loss of sensation has not affected his strength, range of motion, mobility, or ability to sit comfortably.
>
> Accordingly, I find that the claimant could perform light work except he requires a sit/stand option allowing him to change positions as needed up to twice per hour while remaining on task. These exertional limitations are supported by his generally normal motor and

> musculoskeletal findings, while accounting for his lumbar spine disorder and neuropathic symptoms, as he demonstrated some loss of sensation and unsteadiness. Moreover, due to his lumbar spine disorder, diabetes, and neuropathy, he can occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch, or crawl, and he can never climb ladders, ropes, or scaffolds. The claimant has not demonstrated any notable manipulative deficits, but I find that he can frequently handle, finger, and feel bilaterally based on his reports of neuropathy while considering his intact dexterity. The claimant must avoid concentrated exposure to extreme temperatures, to humidity, wetness, and vibration, and he must avoid all exposure to hazards due to the combination of his symptoms, which included SIRS and abdominal pain, neuropathy, unsteadiness with toe walking, and limited ability to squat.

(Tr. 26).

Finally, the ALJ considered the medical opinion evidence. The ALJ considered the opinion of Dr. Kneifati that the plaintiff would be limited to less than sedentary work and found the exertional limitations unpersuasive but accounted for some postural and environmental limitations of Dr. Kneifati that the ALJ considered somewhat persuasive. On this score, the ALJ noted that the exertional limitations opined by Dr. Kneifati were not persuasive. The ALJ observed that Dr. Kneifati noted these limitations were necessary to account for the plaintiff's GI bleed and traumatic brain injury, yet there was no objective documentation for a brain injury in the record and his GI issues were acute without ongoing abnormalities or impairment. (Tr. 27). The ALJ also considered the exertional limitations opined by Dr. Kneifati inconsistent with his own examination or other examinations of record

since Dr. Kneifati, while noting unsteady toe walking, some hypoesthesia in the lower extremities, also reported that the plaintiff had a normal stance, did not need assistance with mobility activities, and had no deficits in his deep tendon reflexes, strength, or range of motion in the extremities. (Id.) According to the ALJ, "the lack of any documented impairment in gait or other motor deficits is not consistent with the less than sedentary exertional abilities provided here." (Id.) Nonetheless, the ALJ did find the postural limitations opined by Dr. Kneifati to be supported by the limited range of motion in his lumbar region and lumbar x-rays showing mild osteophytes and the environmental limitations reasonably consistent with the plaintiff's unsteadiness with toe walking and the combination of his diabetes, neuropathy, and SIRS. (Id.) Moreover, the ALJ accommodated for the limited foot control use by providing the plaintiff with a sit/stand option due to his neuropathy. (Id.)

The ALJ found the opinions of the State agency medical consultants to be generally persuasive, noting that the limitation to light work with postural and environmental limitations remained generally consistent with the medical evidence showing improved A1C control and no additional findings relating to his neuropathy or lumbar spine disorder as well as the findings from the consultative examination and other exam findings showing loss of sensation in the lower extremities and limited lumbar range of motion but otherwise normal strength and unimpaired gait.

(Tr. 27). Nonetheless, the ALJ did provide a sit/stand option and somewhat greater postural limitations than those opined by the State agency consultants to account for the plaintiff's neuropathy causing loss of sensation in his lower extremities. (Id.)

Thus, the ALJ fashioned an RFC that incorporated the parts of each medical opinion the ALJ found persuasive based on their consistency with the record and supportability with the other medical evidence.

Having made these findings, the ALJ concluded that Guyer could not perform any past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Guyer could perform. (Tr. 28-29). Specifically, the ALJ explained that, since the RFC limited the plaintiff to a reduced range of light work, the ALJ relied upon the testimony of the vocational expert at the hearing to determine whether jobs exist in the national economy that the plaintiff could perform. As the ALJ explained:

> To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
>
> • Office helper, DOT 239.567-010, light and unskilled work at SVP 2. There are approximately 16,000 jobs in the national economy, which represents a 50 percent reduction in job numbers due to the sit/stand option.

> • Storage-facility rental clerk, DOT 295.367-026, light and unskilled work at SVP 2. There are approximately 22,000 jobs in the national economy, which represents a 50 percent reduction in job numbers due to the sit/stand option.
>
> • Furniture-rental clerk, DOT 295.357-018, light and unskilled work at SVP 2. There are approximately 11,500 jobs in the national economy, which represents a 50 percent reduction in job numbers due to the sit/stand option.
>
> The vocational expert testified that they relied on their professional experience in providing testimony on areas not addressed by the Dictionary of Occupational Titles, including time off task, unscheduled breaks, and a sit/stand option. I accept such testimony and, pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

(Tr. 29). Thus, even considering the sit/stand limitations the ALJ assessed to account for the plaintiff's neuropathic symptoms, the vocational expert identified nearly 50,000 jobs the plaintiff could perform in the national economy considering his age, education, work experience, and RFC. Accordingly, the ALJ concluded Guyer had not been met the exacting standard of disability set by law from the amended onset date through the date of his decision. (Tr. 29-30)

This appeal followed. (Doc. 1). On appeal, Guyer launches a multifaceted attack of the ALJ's decision, challenging the ALJ's assessment of the medical opinion evidence and symptom evaluation specifically with regard to his neuropathy. The plaintiff also alleges the ALJ failed to identify a significant number of jobs that he could perform in the national economy. However, finding that

substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we recommend the Court affirm the decision of the Commissioner.

## III. Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review, "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather, our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42

U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe

impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### D. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer

give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the

> persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);

> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### E. Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is illustrated by those cases which consider analysis of a claimant's reported symptoms. When evaluating lay testimony regarding a claimant's reported symptoms we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must

> specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR

16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has

received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

### F. The ALJ's Decision is Supported by Substantial Evidence.

Despite a relatively meager medical and administrative record in this case, the plaintiff has launched a multifaceted attack of the ALJ's decision, challenging the ALJ's evaluation of his symptoms and the opinion evidence as well as the number of jobs available that he could perform in the national economy. Despite this systematic approach, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported this thorough and well-articulated decision by the ALJ. Therefore, we will affirm this decision.

**1. Substantial Evidence Supports the ALJ's Evaluation of the Medical Opinion Evidence.**

The plaintiff first challenges the ALJ's evaluation of consultative examiner Dr. Kneifati's opinion. As previously explained, the ALJ concluded that the exertional limitations opined by Dr. Kneifati, which would have limited him to less than sedentary work, were unpersuasive both because they were based upon impairments which were not objectively supported by the medical records, including a traumatic brain injury that has no basis in the medical record, and because the exertional limitations were not supported by his own examination, and other examinations in the record, which showed no difficulties with strength, reflexes, or range of motion and no gait abnormalities. For the plaintiff's part, he argues that Dr. Kneifati's opinion was supported by other findings from his examination, including short steps, unsteadiness while walking on toes, limited squat ability, tender joints, and hypoesthesia below the knee and to toes bilaterally - and consistent with other evidence in the record including evidence of neuropathy in the plaintiff's feet - and the ALJ should have found this opinion persuasive.

But, as this case illustrates, the scope of the Court's review is limited to determining whether the ALJ's evaluation of the medical opinion evidence included an adequate explanation, supported by substantial evidence. Indeed, we are enjoined to refrain from trying to re-weigh the persuasiveness of the medical opinions. Rather, our review focuses on whether the ALJ adequately articulated the reasons for finding these opinions unpersuasive. On this score, "[a]n ALJ is specifically required to 'explain how [he or she] considered the supportability and consistency factors' for a medical opinion." Andrew G. v. Comm'r of Soc. Sec. at *5 (citing 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2)). But ultimately, provided that the decision is accompanied by an adequate, articulated rationale, examining these factors, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Judged against these standards, we conclude that the ALJ's analysis of the medical opinion evidence in this case was supported by substantial evidence. Indeed, the ALJ acknowledged Dr. Kneifati's findings of hypoesthesia and unsteadiness while walking on toes, but noted that the lack of any gait abnormalities and examination findings of normal stance, no need for assistance with mobility activities, and no deficits in his deep tendon reflexes, strength, or range of motion in the extremities was inconsistent with a findings of less than sedentary work abilities.

(Tr. 27). Further, the ALJ did account for some of the limitations opined by Dr. Kneifati, to the extent he found the limitations supported by and consistent with the record as a whole, including the postural and environmental limitations opined by the consultative examiner, which the ALJ found somewhat persuasive. The ALJ also accommodated the limited foot control use by providing the claimant with a sit/stand option due to his neuropathy. Finally, the RFC formulated by the ALJ reflects the opinion of the State agency consultant opinions which the ALJ found to be persuasive based upon their consistency and supportability with the record. Thus, to the extent the plaintiff argues the ALJ was required to adopt the opinion of Dr. Kneifati in its entirety and erred in failing to adopt a less than sedentary RFC based upon this decision, in our view the ALJ adequately explained and articulated the reasons parts of this opinion were adopted and parts were found inconsistent with the record as a whole. This is all that the law requires. Accordingly, substantial evidence supports the ALJ's evaluation of the medical opinion evidence.

2. **The Commissioner Met His Burden of Establishing a Significant Number of Jobs in the National Economy the Plaintiff Can Perform.**

The plaintiff also argues that the Commissioner has not met his burden at Step 5 of the sequential analysis of establishing a significant number of jobs in the

national economy that he can perform. In this regard, the controlling regulations define the Commissioner's burden of proof in the following terms:

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny you disability benefits on the basis of the existence of these kinds of jobs. If work that you can do does not exist in the national economy, we will determine that you are disabled. However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

20 C.F.R. § 404.1566. In reaching a conclusion regarding the existence of significant jobs in the national economy, the Commissioner "will take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 416.966(d); 20 C.F.R. § 404.1566(d). In addition, the Commissioner may use the services of a vocational expert or other specialist to aid in this determination. 20 C.F.R. § 416.966(e); 20 C.F.R. § 404.1566(e).

Notably the regulations do not set any precise metrics for assessing what may be a significant number of jobs and generally courts have not articulated some definitive arithmetic boundary defining a "significant number" of jobs. See, e.g., Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) ("We are not blind, however, to the difficult task of enumerating what constitutes a 'significant number' . . . The

decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation."); Trimar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1993) ("This Circuit has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number' and reject the opportunity to do so here.").

Nonetheless, the Third Circuit has provided us with benchmarks regarding what constitutes a substantial number of jobs in the national economy, finding that, "the testimony from the vocational expert that 20,000 jobs were available in the national economy is sufficient to support a finding that work exists in significant numbers." Young v. Astrue, 519 F. App'x 769, 772 (3d Cir. 2013). Conversely, when the number of jobs identified in the national economy totals less than 10,000 positions, or the number of regional jobs falls below 100, courts have frequently found that the Commissioner's burden of proving at Step 5 that jobs existed in significant numbers in the national economy has not been met. See e.g., Beltran v. Astrue, 700 F.3d 386, 389 (9th Cir. 2012) (135 jobs in the regional economy held not significant); Ellis v. Kijakazi, 553 F. Supp. 3d 628, 635 (E.D. Wis. 2021) (remanding where only 14,500 jobs identified in the national economy); Ochoa v. Colvin, No. 1:12-CV-00604-SKO, 2013 WL 4816130, at *8 (E.D.Cal. Sept. 6, 2013) (80 jobs in Sacramento were not significant); Valencia v. Astrue, No. C 11-06223

LB, 2013 U.S. Dist. LEXIS 41758, 2013 WL 1209353, at *18 (N.D.Cal. Mar. 25, 2013) (114 regional jobs in San Francisco Bay area and 14,082 national jobs were not significant); Lenon v. Apfel, 191 F. Supp. 2d 968, 979 (W.D. Tenn. 2001) (117 jobs in the regional economy held not significant); Jimenez v. Shalala, 879 F. Supp. 1069, 1076 (D. Colo. 1995) (200–250 jobs in regional economy held not significant).

Here, the ALJ properly relied upon the testimony of the vocational expert that, considering the plaintiff's age, education, and RFC he could perform the jobs of office helper, facility rental clerk, and furniture rental clerk. (Tr. 52-54). The plaintiff argues there are not a significant number of these jobs available, citing to two cases from other districts which they purport state that 60,000 and even 120,000 jobs does not represent a significant number of jobs. But, as we have noted, the Third Circuit has found that, "the testimony from the vocational expert that 20,000 jobs were available in the national economy is sufficient to support a finding that work exists in significant numbers." Young v. Astrue, 519 F. App'x 769, 772 (3d Cir. 2013). Here, even considering a 50% reduction in the identified jobs due to the sit/stand option, the vocational expert testified to nearly 50,000 jobs that exist in the national economy that the plaintiff can perform. Given the strong Third Circuit precedent finding far fewer than 50,000 jobs constitutes a significant number in the national economy, we are bound to conclude that substantial evidence supported the ALJ's

conclusion that a significant number of jobs existed that the plaintiff could perform. See Sanchez v. Comm'r Soc. Sec., 705 F. App'x 95, 99 (3d Cir. 2017) (18,000 jobs in the national economy is a significant number); Hoppock v. Comm'r of Soc. Sec. Admin., No. 3:20-CV-02424, 2022 WL 1424982, at *6 (M.D. Pa. May 5, 2022) (21,428 jobs constituted a significant number); TERESA CAROL RIFFEE, Plaintiff, v. KILOLO KIJAKAZI, COMMISSIONER OF SOCIAL SECURITY, Defendant., No. CV 20-1328, 2021 WL 3913972, at *2 (W.D. Pa. Sept. 1, 2021) (11,300 jobs constituted a significant number).

**3. Substantial Evidence Supports the ALJ's Symptom Evaluation**

Finally, the plaintiff advances two arguments relating to the ALJ's evaluation of his subjective symptoms, first specifically challenging the ALJ's treatment of his peripheral neuropathy, and then challenging the symptom evaluation in general. Guyer argues that the ALJ's evaluation of his subjective symptoms was flawed and the ALJ's conclusion that his statements were not entirely consistent with the medical evidence was not supported by substantial evidence. However, our review of the ALJ's decision and the record as a whole reveals that the ALJ's evaluation of his symptoms complied with the regulations.

At the outset, with regard to the plaintiff's peripheral neuropathy, Guyer argues the ALJ failed to mention contradictory probative evidence of the limitations

caused by his neuropathy, but, upon review, it appears the ALJ thoroughly considered this impairment, which the ALJ considered to be severe, and explained how the limitations it caused were incorporated into the RFC at various points in the decision. For example, as the ALJ explained:

> The claimant did report ongoing neuropathic symptoms during his primary care and endocrinology visits; however, the exams did not show pervasive and chronic symptoms as alleged by the claimant (Exhibits 1F/14; 7F/8, 12). For example, monofilament testing from June 12, 2023, was notable for hypersensitivity in the bilateral feet with absent vibratory sensation, but his gait was unimpaired (Exhibit 2F/7-8). A monofilament test from March 25, 2023, which was within the month he alleged an onset of disability, was normal (Exhibit 1F/16). By July 20, 2023, the claimant reported walking and doing everything normally but feeling slower (Exhibit 5F/3-4). He exhibited some unsteadiness with toe walking, and he had some limited ability to squat during his consultative examination on August 22, 2023 (Exhibit 6F/3-7). There was also hypoesthesia below the knees to the toes bilaterally to light touch. The consultative examination and other exams of record showed no deficits in strength or other musculoskeletal abnormalities consistent with debilitating neuropathic symptoms from his diabetes (Exhibits 1F/6, 16; 2F/7-8; 4F/14; 5F/7; 6F/3-7, 14-17). I also note that, while the claimant alleged neuropathy affecting his hands and manipulative abilities, he demonstrated intact hand and finger dexterity, and he was able to zip, button, and tie shoelaces during his consultative examination. The medical evidence is not consistent with the alleged severity of his diabetic neuropathy or other complications from diabetes.

(Tr. 25). Thus, it is clear the ALJ considered the plaintiff's alleged symptoms in the context of the objective medical record, considering the evidence the plaintiff alleges was omitted. Specifically, the ALJ considered the plaintiff's statements regarding

the limiting effects of his neuropathy but explained these limitations were not supported by objective monofilament testing and examination findings of normal gait and full strength. Moreover, with regard to his hand dexterity, no expert opined Guyer would have limitations in that arena and he was able to zip, button, and tie shoelaces during the consultative examination. Clearly the ALJ appropriately considered this impairment including medical signs and laboratory findings, diagnoses, and medical opinions. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. There was no error here.

The plaintiff's other arguments challenging the ALJ's symptom evaluation are similarly unavailing. As already explained, the ALJ comprehensively evaluated the plaintiff's diabetes symptoms and accounted for them to the extent they were supported by the record in the RFC. While the ALJ noted there was little evidence that the plaintiff complained of back pain in the record, the ALJ included postural limitations in the RFC to account for limited range of motion in the lumbar spine that was supported by the objective medical evidence. Finally, to the extent the ALJ was required to consider the plaintiff's work history in evaluating his credibility, it is clear that:

> Although a claimant's work history is one of many factors the ALJ considers in assessing an individual's subjective complaints, 20 C.F.R. § 404.1529(c)(3), the ALJ is not required to equate a long work history with credibility. See Christl v. Astrue, 2008 WL 4425817, *12

> (W.D.Pa. Sept.30, 2008). Thus, a claimant's work history alone is not dispositive of the question of . . . credibility.

Patton v. Astrue, No. CIV.A.08-205J, 2009 WL 2876715, at *3 (W.D. Pa. Sept. 8, 2009). Rather "[w]ork history 'is only one of many factors an ALJ may consider in assessing a claimant's subjective complaints.'" Sanborn v. Colvin, No. CIV.A. 13-224, 2014 WL 3900878, at *16 (E.D. Pa. Aug. 11, 2014), aff'd sub nom. Sanborn v. Comm'r of Soc. Sec., 613 F. App'x 171 (3d Cir. 2015). In the instant case, given the substantial body of clinical, opinion, and anecdotal evidence supporting the ALJ's decision, the ALJ was not obliged to reach a contrary conclusion based solely upon Guyer's work history. There was no error here.

Simply put, the plaintiff's attack on the ALJ's symptom analysis is, at bottom, a request that this court re-weigh the evidence. This we may not do. See Chandler, 667 F.3d at 359 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations"); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude there was no error in the ALJ's evaluation of Guyer's symptoms.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and recommend the Court affirm the decision of the Commissioner.

## IV. **Recommendation**

For the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner in this case should be affirmed, and the plaintiff's appeal denied.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Submitted this 18th day of September 2026.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge